The **PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA,**
Petitioner,

v.

**UNITED STATES of America and Federal Communications Commission,**
Respondents.

No. 20004.

United States Court of Appeals
Ninth Circuit.

Feb. 9, 1966.

---

Richard E. Tuttle, Chief Counsel, Mary Morgan Pajalich, Principal Counsel, Roderick B. Cassidy, Asst. Chief Counsel, James A. Blumberg, Asst. Counsel, San Francisco, Cal., for petitioner.

Donald F. Turner, Asst. Atty. Gen., Lionel Kestenbaum, Atty., Dept. of Justice, Washington, D. C., Henry Geller, Gen. Counsel, John H. Conlin, Asst. Gen. Counsel, Robert D. Hadl, Counsel, Federal Communications Comm., Washington, D. C., for respondent.

Before HAMLIN, Circuit Judge, MADDEN, Judge of the Court of Claims, and JERTBERG, Circuit Judge.

MADDEN, Judge:

Petitioner, the Public Utilities Commission of the State of California, appears in its capacity as a representative of the People of the State of California and for itself as a regulatory agency and as a telephone ratepayer. It asks this court to review and set aside a Memorandum Opinion and Order of the Federal Communications Commission (hereafter the Commission) dismissing its petition for a rehearing in a Commission proceeding entitled "Special Meeting with Regard to Bell System Interstate Earnings." Jurisdiction to review the Commission's action dismissing the petition for rehearing rests upon Section 402(a) of the Communications Act, as amended 47 U.S.C. § 402(a) and the Judicial Review Act, 5 U.S.C. §§ 1031–1042.

Pursuant to its auhority to regulate interstate telephone rates, the Commission from time to time holds what it deems "informal" conferences with representatives of the Bell System companies as part of its policy of "continuing surveillance" over interstate rates. The controversy here grew out of a series of such meetings held for six days spread over a period of several months in 1964. At these meetings the Commission heard presentations by Bell System and Commission representatives regarding Bell System interstate operations and earnings. Witnesses were not sworn, but opening and closing arguments were made and exhibits used, though not formally introduced into evidence.

Sometime after this series of meetings was concluded the Commission issued a Public Notice stating that the Bell System companies would submit tariffs proposing major reductions in interstate telephone rates amounting to approximately 100 million dollars annually. Thereafter Bell System filed tariffs effective on the dates designated in the Commission's Public Notice by which interstate rates were reduced in the amounts and categories of service set out in the Public Notice.

Within thirty days from the date of the Public Notice petitioner filed with the Commission a request for a rehearing in the matter of the Special Meeting with Regard to Bell System Interstate Earnings claiming that the Special Meeting was a "proceeding" within the meaning of Section 405 of the Communications Act of 1934, 47 U.S.C. § 405. Section 405 provides for the filing of a petition for rehearing by persons aggrieved by action taken in any "proceeding" of the Commission. Petitioner alleged that the Commission had violated Sections 205(a) and 409 of the Communications Act and certain provisions of the Administrative Procedure Act, 5 U.S.C. §§ 1001–1011, by denying it an opportunity to be heard in the proceeding and contended that in various ways the Commission had failed to discharge its rate-making responsibilities.

By Memorandum Opinion and Order released February 12, 1965, the Commission dismissed the petition for rehearing on the principal ground that "The Public Notice issued on November 25, 1964, did not and could not bind anyone to any action, nor was it a ruling on the proposed tariff filing." From this Memorandum and Order petitioner appeals.

In support of its contention that it was unlawfully denied notice and an opportunity to be heard, petitioner claims that the Public Notice issued by the Commission at the conclusion of the Special Meeting proceeding was an "agency action" within the meaning of Section 2(g) of the Administrative Procedure Act, 5 U.S.C. § 1001(g), and, specifically, was agency action constituting "rule making" in that it involved the "approval or prescription for the future" of interstate telephone rates. The Administrative Procedure Act defines "rule" in part to include "the approval or prescription for the future of rates * * *", and "rulemaking" as "agency process for the formulation, amendment, or repeal of a rule." 5 U.S.C. § 1001(c). On the basis of these assertions, petitioner argues that the Commission violated Sections 4, 7 and 8 of the Administrative Procedure Act, 5 U.S.C. §§ 1003, 1006, 1007, which provide for notice and an opportunity to

be heard in agency proceedings where rule making is involved.

The legislative history of the Administrative Procedure Act indicates that the phrase "approval or prescription" as used in Section 2(c) of the Act was derived from the Supreme Court's opinion in Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932). See S. Rep. No. 752, 79th Cong., 1st Sess. 225 (1946). In the Arizona Grocery case the issue turned "upon the power of the Interstate Commerce Commission to award reparations with respect to shipments which moved under rates *approved or prescribed* by it," (emphasis supplied), 284 U.S. at 381, 52 S.Ct. at 183. In resolving that issue the court drew a distinction between carrier-made rates and Commission-made rates and used the phrase "approved or prescribed" in referring to rates promulgated by the Commission in exercise of its quasi-legislative authority to set rates for the future. Petitioner's appeal, then, boils down to the question whether the rates announced in the Commission's Public Notice were carrier-made or Commission-made, i. e., approved or prescribed by the Commission. If the Commission's action here was not one of "approval or prescription," then the Commission was not "rule making," and the Administrative Procedure Act's provisions for notice and opportunity to be heard would not apply.

The question whether a rate was approved or prescribed was considered in the case of Interstate Commerce Commission v. Inland Waterways Corp., 319 U.S. 671, 63 S.Ct. 1296, 87 L.Ed. 1655 (1943). There several eastern railroads had filed new tariffs with the I.C.C., which suspended them for the statutory period and instituted an investigation. A later order vacating the order of suspension and discontinuing the proceeding held that "[t]he proposed schedules are shown to be just and reasonable and are not shown to be otherwise unlawful," 319 U.S. at 682, 63 S.Ct. at 1303. In answer to the charge that the I.C.C. had approved or prescribed the rates the court said:

This form of finding has been held by the Commission not to constitute an approval or a prescription of the rates under suspension. Since the Commission refused to approve or prescribe them, they stand only as carrier-made rates which, under the Commission's decisions, leave them open to possible recovery of reparations. Like the Commission, we also refrain from approving or prescribing them. (Footnotes omitted), 319 U.S. at 686–687, 63 S.Ct. at 1305.

In Ex Parte No. 115, 208 I.C.C. 4 (1935), railroad carriers requested authority to make certain increases of a general nature in their freight rates and charges. The I.C.C. rejected the railroads' proposals and proposed instead its own plan of "carefully selected moderate" increases, 280 I.C.C. at 58–61. It authorized the filing of new supplemental tariffs in accordance with its recommendations and declared that the supplements would be permitted to take effect without suspension, 208 I.C.C. at 60. It added that the rates would be subject to complaint and investigation and that Arizona Grocery, supra, would not apply to bar the possibility of future reparations. The railroads filed the rates proposed by the Commission. Certain shippers then brought an action to review the Commission's proceedings, alleging, inter alia, that the Commission had determined just and reasonable rates on insufficient findings of fact and asking the court to annul the Order of the Commission authorizing the filing of the supplemental tariffs. Algoma Coal & Coke Co. v. United States, 11 F.Supp. 487 (E.D.Va.1935). The three judge court held:

The position taken by the plaintiffs seems to misconceive the real nature and effect of the Commission proceeding. They take the view that what the Commission did in effect was to determine what would be just and reasonable rates for particular traffic transported by particular railroads, on insufficient findings of fact. * * * As already pointed

out, in our opinion this misconceives what the Commission did. It *prescribed* no particular rates. It merely permitted the carriers to file new rates without suspension. \* \* \* That is to say, the increased rates now complained of are *carrier made* rates and not *Commission* made rates. (Emphasis in original Id. at 493–494.)

The district court in Algoma reached the conclusion that the Commission had not prescribed the rates filed by the railroads in spite of the fact that the new tariffs followed extensive hearings at which over 8000 pages of testimony were taken and in spite of the fact that, as in the present case, the new tariffs were filed at the Commission's direction subsequent to the hearing.

These cases indicate that the phrase "approval or prescription for the future of rates" had an established meaning when incorporated into Section 2(c) of the Administrative Procedure Act in 1946. Under the Arizona Grocery decision it referred to a commission-made rate which was not subject to reparations in a subsequent proceedings, which was binding on the carrier, and which was not subject to alteration except after further hearing. On the basis of the Arizona Grocery decision it had been held that a finding that schedules were "shown to be just and reasonable" did not amount to approval or prescription of rates where the agency had made it clear that it did not so regard its action. Interstate Commerce Commission v. Inland Waterways Corp., supra. And such approval did not occur even though the agency had declared in advance that new rates would be filed and would not be suspended when filed. Algoma Coal & Coke Co. v. United States, supra.

■ Applying these principles here, we hold that the "Public Notice" issued by the Commission did not constitute "approval or prescription for the future of rates" within the established meaning of that phrase. The Notice did not preclude ratepayers from seeking damages

in a subsequent proceeding; it did not bind the carrier by ordering the Bell System companies to file the proposed tariffs; and it did not preclude them from filing new or revised tariffs upon their own motion. The Commission's Memorandum Opinion and Order dismissing petitioner's request for a rehearing specifically stated that the filing was subject to challenge on the ground that the existing or proposed rates were unreasonable. Accordingly, the Commission was not rule-making in the proceeding in question and the notice and hearing provisions of Sections 4, 7, and 8 of the Administrative Procedure Act are not applicable.

■ Petitioner claims that the Commission has also violated the hearing provisions of Sections 204 and 205 of the Communications Act. Sections 204 and 205 of that Act provide for notice and hearing whenever after the filing of a new rate the Commission exercises its discretion to "enter upon a hearing concerning the lawfulness thereof \* \* \*." 47 U.S.C. § 204. Under section 205 the Commission may, after full opportunity for a hearing, "determine and prescribe what will be the just and reasonable charge \* \* \* to be thereafter followed \* \* \*." 47 U.S.C. § 205(a). As we have determined that the Commission proceeding in question here was not one for the "approval or prescription for the future of rates" within the meaning of the Administrative Procedure Act, neither was it a proceeding concerning the lawfulness of new rates within the meaning of 47 U.S.C. § 204, nor did the Commission "determine and prescribe" what would be just and reasonable charges for the future within the meaning of 47 U.S. C. § 205. Accordingly, the notice and hearing provisions of these sections are also inapplicable to the proceeding in question and petitioner's claim based upon them is, likewise, without merit.

In addition to its allegations of specific procedural defects under the Administrative Procedure Act and the Communications Act, petitioner asserts that the entire procedure culminating in the Commission's Public Notice was an abuse of

the Commission's discretion which deprived petitioner of due process. Petitioner takes the position that if the procedural requirements of notice and opportunity to be heard are held inapplicable to the kind of informal procedures of the Commission's "continuing surveillance" practices in question here, then the Commission, for all practical purposes, is free to conduct rate-making procedures which are beyond the reach of the judicial review which Congress has provided. Fundamental to this position is the assumption that, in spite of whatever disclaimer the Commission might make regarding its intention to bind anyone to any action through the kind of procedure followed in this case, the Bell System companies, as a business subject to the Commission's regulation, realistically are not in a position to disregard the terms of any agreement pressed upon them by the Commission in such proceedings. The result, petitioner concludes, is patently a rate-making procedure which denies it due process because it is neither authorized nor countenanced by Congress and violates the command of Section 4(j) of the Communications Act that the Commission " * * * conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." 47 U.S.C. § 154(j).

We do not think, however, that a claim of constitutional dimensions is properly before us on this appeal. Petitioner recognizes that ratepayers have no vested right to service at any fixed rate but contends that they have a right, here denied, to a reasonable rate. While such a right undoubtedly exists and is recognized in the Communications Act,

we do not see wherein petitioner has standing to claim its violation without first challenging the reasonableness of the existing rates, which petitioner has specifically refrained from doing. The thrust of petitioner's due process claim must necessarily be directed at some unlawful deprivation of property resulting from the challenged procedures, for without the unlawful deprivation of property, there can be no violation of any process "due" petitioner under the Fifth Amendment.

Even if they had merit, petitioner's allegations of lack of notice and opportunity to be heard could not raise constitutional questions unless proceeding from a deprivation of property claim. Public utility regulation, historically, has been a function of the legislature; and the prescription of public utility rates by a regulatory commission, as the authorized representative of the legislature, is recognized to be essentially a legislative act.[1] Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 589, 65 S.Ct. 829, 89 L.Ed. 1206 (1945). As a ratepayer would have no constitutional right to participate in a legislative procedure setting rates, this right to be heard in a commission proceeding exists at all only as a statutory and not a constitutional right.

Neither can petitioner's broader claim that it has been denied due process by procedures which exceed the scope of the Commission's lawful authority raise constitutional issues unless predicated upon an unlawful deprivation of property. Apart from specific statutory limitations upon the Commission's procedures, of which we have found no violation here,

[1.] This raises the question of whether petitioner has standing to maintain this suit in its capacity as a representative of the people of the State of California. It has long been recognized that a state, as *parens patriae,* cannot institute judicial proceedings to protect citizens of the United States from the operation of federal statutes because it is the United States, not the state, to whom citizens of the United States must look as *parens patriae* for protection of whatever rights they might have under federal legislation. Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). A state would appear to be in no better position to sue to protect its citizens from acts of a regulatory commission acting in a legislative capacity. We need not answer this question, however, as petitioner also appears on its own behalf as a ratepayer claiming, in the first instance, statutory rights sufficient to invoke our jurisdiction.

petitioner has no interest in these procedures except in so far as they are ultimately manifested in the established rate. Constitutional due process does not exist in a vacuum; and only through a challenge to existing rates, if at all, could petitioner allege the requisite effect on its property. Those rates stand unchallenged here.

As the Commission pointed out in its Memorandum Order and Opinion, petitioner has a statutory right to direct its challenge to the rates themselves and request a formal hearing on the issue of their reasonableness. The assertion by petitioner that the procedures adopted by the Commission are not within its lawful discretion and do not "conduce to the proper dispatch of business and to the ends of justice" is not in itself, however, a valid statement of a violation of constitutional due process. All law is not constitutional law.

The decision of the Commission is affirmed.